Vajst Brunt, P. J.
In the disposition of the various appeals taken by the defendants from the judgment entered herein, it will only be necessary to discuss a very small portion of the voluminous record presented upon this appeal and to consider the questions raised upon the appeal only upon admitted facts. Various exceptions were taken to the admissibility of evidence and to the striking out or withdrawal of evidence, which it is not at all necessary to consider, as the evidence to which such exceptions relate in no way affects the facts upon which our conclusions are founded.
It appears from the evidence in the case that the defend *171 ant William. H. Brown commenced business at the foot of East 14th street, in the city of New York, about August, 1874, such business being the buying and selling of building materials. The defendant Brown had no experience or knowledge of the business and the same was managed by his son-in law. David E. Hawkins, until the fall of 1879, when Hawkins became a partner, and the business was subsequently carried on in the name of William H. Brown, although the name of Brown & Hawkins was sometimes used. Hawkins contributed no capital to the business. During all this time the defendant, William H. Schmohl, was a clerk first with Brown, and afterwards with Brown & Hawkins, and he remained such clerk until the making of the assignment hereinafter mentioned on the 16th of April, 1880. It further appears from the evidence that up to the fall of 1879 the business of William H. Brown had been fairly prosperous, but that immediately after the formation of the new firm Hawkins entered upon the scheme of cornering the building material market, and in furtherance thereof bought large amounts of building material such as lime, lath, cement, etc., of various parties and soon became pressed for money. Shortly prior to the 20th of January, 1880, Hawkins made application to Hollis L. Powers for money with which to carry them through, and proposed that if Powers would advance seventy-five cents a barrel on lime and cement, they would bill it to him and buy it back at the expiration of three months at a profit of twenty-five cents per barrel. Hollis L. Powers transferred this negotiation over to his brother Ellis E. Powers, and it was finally consummated in his name, and he advanced $2,250 and took a bill of sale about January 15th, 1880, of 3,084 barrels of lime and cement together with the shed in which the lime and cement were kept.
At the same time Hawkins gave to Powers an agreement to pay all the expenses of insurance, storage, rent, cartage, labor and other outlay or expense in the keeping, storing, insuring and transfer or shipping of said lime and cement; and to sell the said lime and cement at any time said Powers might request at a price by Powers named; and that if sold for one dollar a barrel Powers was to receive the whole amount and Brown & Hawkins to pay out of their own pockets the expenses above mentioned; and if sold for more than one dollar per barrel Brown & Hawkins were to have all over that amount, bearing the said expenses; but if sold for more than $1.25 per barrel Powers was to have one dollar and one-half of all over $1.25 per barrel, Brown & Hawkins paying all expenses. Brown & Hawkins further agreed that if the said lime and cement were not sold at the request of Powers prior to the expiration of three months *172 from the date of the agreement, then, at the expiration of the three months, Brown <& Hawkins agreed to give said Powers one dollar per barrel therefor and pay all expenses.
Mr. EUis K. Powers swears that Hawkins told him that-he wanted to corner the market, but that he (Powers) did not know what it meant; that he had bought or sold stocks-but never had cornered any. It seems somewhat strange if Mr. Powers did not know what cornering the market meant, that he could be- sure that he had never cornered any stocks. •
Lime at the time of this transaction was worth from eighty-nine and one-half cents to one dollar a barrel in the market. On the 20th of January, 1880, Hollis L. Powers advanced $7,500 to Brown & Hawkins and received a bill of sale for 12,388 barrels of lime, and also an agreement similar to the one given to Elias K. Powers. Brown & Hawkins had this lime insured for $10,000 in Powers’ name. It was burned up and Powers received the insurance. On the 24th of February, 1880, Hawkins applied to Hollis L. Powers for an advance on lath, and gave him a bill of sale of 5,469,000 lath, and made an agreement to buy back the lath within sixty days at two dollars a thousand, Brown & Hawkins to pay all expenses of every kind and nature as in the foregoing agreement.' Powers advanced $3,000 at that time, and testified that he could not tell what price he was to pay for the lath, whether $1 or $1.25 a thousand. The laths were then worth two dollars a thousand at least. On the twenty-seventh of February.. Powers appears to have advanced $3,000 more, and on March first, $2,500 on account of above bill of sale of lath and another transaction. What this transaction was is not stated. On the eighteenth of March Powers gave a check for $700 more. On the twenty-fourth of March Powers received a bill of sale of 2,000 barrels of lime and also an agreement from Brown & Hawkins, dated the twenty-seventh, to buy back the same as before. On the twenty-sixth of March a bill of sale of 2,000,000 of lath was given to Powers, upon •which he is claimed to have advanced money, but how much he could not tell, nor could he tell the price which he was to pay for the same.
On the ninth of December, 1879, Brown & Hawkins sold to Schmohl 500,000 of brick at $7.25 a thousand, amounting-to $3,625. Schmohl paid $3,000 by check. The balance was represented by a note of Brown & Hawkins which Schmohl claims to have held. Hawkins gave Schmohl at the time of this transaction a note for $3,625, the amount of the purchase price of the brick. The exact purpose of this note it seems difficult to understand, unless it was to protect Schmohl from loss upon the brick. It appears that about. *173 three months subsequently Schmohl sold the brick back to Brown & Hawkins for ten dollars a thousand, which amount however was not paid in. cash to Schmohl. This purchase was made in pursuance of an agreement made at the time that Schmohl purchased the brick, that Brown & Hawkins would take the brick back at the expiration of three months at an advanced price. On the sixteenth of February, 1880, Brown & Hawkins sold to Schmohl 1,000,000 of lath at two dollars a thousand, and received from him $2,000 and gave a note to pay back $3,000 in three months and take back the lath. On the 14th of April, 1880, William H. Brown gave to Schmohl a bill of sale dated April thirteenth, of all the personal property of Brown & Hawkins, at the foot of Fourteenth street, to secure an alleged debt of $8,000, made up of $5,000 due on purchase of brick and $3,000 note given on purchase of lath, and told him that he would also give him $3,000 in a few days, and that whatever the difference might be they would arrange it.
Ho arrangement whatever was made as to the price at which Schmohl was to take the materials mentioned in the bill of sale. Schmohl claims to have gone into possession under that bill of sale, and assumed control of all the property therein named, except the sheds and office building and stable which, however, will be subsequently shown was not true in fact. At the time of receiving this bill of sale, Schmohl returned the note for $3,625, and the note for $3,000. It appears that prior to this Hawkins had gotten in trouble with the defendants Murchie and Powers, and Hawkins swears that he told Schmohl about the trouble with Murchie, although Schmohl swears that he did not know anything about it, and a witness by the name of Friedleben says that Schmohl told that they (meaning Brown & Hawkins), owed him a lot of money, and when he got the bill of sale, he was not aware that he had got it until they actually gave it to him, and that he only got it because Brown & Hawkins expected some trouble with Murchie, and they wanted to put this beyond Murchie’s reach. It would appear, although Schmolrl alleges that he took possession of the property, that after this bill of sale the business was continued as before, and that goods continued to be sold in the name of Brown & Hawkins, and entries of such sales were made in their books, and that the employees of Brown & Hawkins knew nothing of the alleged sale until after the assignment, the only person to whom Schmohl ever stated that he owned the materials before the assignment was Murchie, when he claimed a part of the goods as having been assigned to him by Hawkins. The testimony of Schmohl as to this transaction, is suspicious to say the least. He testified that he did not *174 know anything about the insolvency of Brown & Hawkins, or that they were in difficulties, although he held a bill of sale of all their stock in trade at their principal place of business, and that he made no inquiries whatever. He also testified that he continued as Brown & Hawkins’ clerk until the date of the assignment'at a salary of $30 a week, and that all of it was paid except the last week; and Brown & Hawkins seem to have considered him their clerk until their failure, because the preference to Schmohl is for services as clerk, and no indebtedness for such services existed except for the last week. At or about the time of the assignment Brown also gave to Schmohl an assignment of certain leases which he held of property on Seventh avenue.
On the 16th of April, 1880, Hawkins being pressed by Powers & Murchie, executed an assignment for the benefit of creditors to Hollis L. Powers.
In the execution of such assignment Hawkins signed the name of William H. Brown, per David B. Hawkins, attorney, and also signed his individual name thereto. At this time Hawkins held -no power of attorney from Brown, or authority to execute" the assignment, but a day or two subsequently Brown executed an instrument ratifying the execution of said assignment by Hawkins.
The assignment contained preferences to pay and discharge in full the indebtedness due, and to grow due from the copartnership of Brown & Hawkins to Murchie & Co , Hollis L. Powers and Bartlett & Wilson. It was also provided in the assignment that the demands of said Powers & Murchie & Co., for damages arising upon executory contracts of sale made by Brown & Hawkins, or upon which they might be hable, should not be preferred by the assignment to exceed the sum of $6,000 to each. The assignment also contained a provision for the payment of the indebtedness to Schmohl for services as clerk and for money loaned, amounting to an amount unliquidated.
The plaintiffs in this action having obtained judgment against Brown & Hawkins for goods sold and delivered, and execution upon such judgment having been returned unsatisfied, filed their bill asking to set aside the assignment to Powers, and the transfers to Schmohl as fraudulent and void. After a trial before the court in which the foregoing facts were established, judgment was entered adjudging the sale and assignment of lease to the defendant Schmohl, and the assignment to the defendant Powers fraudulent and void, that the plaintiffs should be paid the amount due upon their respective judgments, out of the property and effects of the judgment-debtors; that the plaintiff recover judgment against the defendant Schmohl for $8,000 and interest, the value of the property received *175 under the bill of sale; that a receiver be appointed of Brown & Hawkins, and of the said leasehold premises; that Powers and Schmohl deliver to said receiver all property under their control; that a referee be appointed to take an account, and giving judgment for costs and allowances against Powers and Schmohl. From this judgment this appeal is taken.
It is claimed upon the part of the defendants that although the transactions between Powers and Brown & Hawkins and Schmohl and Brown & Hawkins may have been a cover for usury, yet that that formed no ground for setting-aside the assignment. The evidence of both Hawkins and Powers showed conclusively that the moneys advanced by Hawkins to Powers were advances upon materials, and that the contracts upon the part of Brown and Hawkins to-buy back such materials was only a device to cover the excessive rates of interest amountingto nearly 150 per cent per annum which Powers was charging for the use of the money. They were not intended as bona fide transactions for the sale and purchase of merchandise. Powers throughout his testimony talks about advances upon lime, upon lath, and upon cement; and in some of the transactions he admits that he does not know that any price was fixed at which he was to pay for the lath which was conveyed to him by the bills of sale.
Under such circumstances it is impossible to come to any other conclusion than that these transactions were not bona fide transactions of sales of goods; but Powers only intended to advance certain sums of money upon the faith of these goods, and then to resort to the expedient of a re-sale in order to cover up the excessive rates of interest which he was charging- Brown & Hawkins for the money. It is true that in other places Powers swore that these transactions were purchases and sales of merchandise; and it is urged on the part of the defendants that if this were not true there would have been no reason for Powers having made the inquiries in regard to the standing of Brown & Hawkins, which it appears he did and that it was only because of the favorable reports whiqh he heard as to their responsibility that he went into these transactions. It is to be noted that the only credit which he gave was for the excessive interest which he expected. to realize for the temporary use of his money because in every instance in which bills of sale were given to Powers where he made advances of money, the merchandise was pretended to be sold to him at prices much below that at which it ruled in the market. This view is enforced by the fact that although Powers purchased this merchandise in form, and although .he claims that it was sold, *176 yet Brown & Hawkins were to pay all the expenses of insurance and of storage upon Powers’ merchandise and all the expenses of handling it out of their own pocket, if Powers chose to direct the merchandise to be sold. It is to be borne in mind also that by the written agreement in reference to this merchandise that Brown & Hawkins are to sell and not Powers. From all these circustances the inevitable conclusion follows that there was no real bona fide sale of merchandise by Brown & Hawkins to Powers, nor was there any bona fide contract of re-purchase by Brown & Hawkins from Powers. The whole scheme as has already been observed was a mere device to cover the excessive rates which which Powers hoped to realise from the money which he loaned to Brown & Hawkins. Powers also states that he had no idea that Brown & Hawkins were in difficulties except just prior to the assignment, and that he had no idea that they were in need of money although they were agreeing to pay him at the rate of 150 per cent per annum for the use of his money. Such being the fact that there were no contracts of a bona fide nature for the purchase and sale of merchandise between Brown & Hawkins and Powers, and that the whole transaction was simply a pledge of merchandise as security for money loaned, it becomes necessary to consider the terms of the assigment and the circumstances which led up to it. It appears from the evidence in the case that the defendants Murchie had stored a large quantity of lath with Brown & Hawkins, and Hawkins had given warehouse receipts therefor.
It also appears from the undisputed evidence in the case that Hawkins had disposed of a part of this merchandise, and that he had also disposed of a part of the merchandise which he had pledged to Powers, and when this was discovered he was made to understand that he had laid himself open to a criminal prosecution; and that it was this fact which led up to the assignment and was the immediate cause of its execution, and of its ratification by Brown, his father-in-law. The object of Hawkins in the making of the assignment primarily was to satisfy Murchie and. Powers, who had him in their power by reason of the facts above mentioned. He therefore makes an assignment preferring Murchie and Powers, in the following language: “ The said party of the second part (meaning Powers) shall pay and discharge in fufi the indebtedness now due and to grow due of the said parties of the first part (meaning Brown & Hawkins) as such copartnership to H. B. Murchie & Co., of 82 Wall street, in the city of New York, Hollis L. Powers, of 556 Fifth avenue, in the city of New York, and Bartlett & Wilson, of No. 48 Wall street, in the city *177 of New York. Provided always however that the demands of said Powers and Murchie & Co for damages arising upon executory contracts of sale with said first parties or upon which they may be liable shall not be preferred hereby to exceed the sum of $6,000 to each of said parties. ” Prom this preference it is manifest that it was the intention of the parties that any loss which Powers might appear to sustain upon his pretended executory contracts with Brown & Hawkins should be paid to the extent of $6,000 This was entirely independent of any claim which he might have for borrowed money, or for the conversion of merchandise which had been pledged to him, and was intended to represent solely the supposed profits to arise from the contracts of sale which he claimed to have made with Brown & Hawkins, and which have heretofore been shown to have been fictitious, and not to have been genuine, valid contracts upon which Brown & Hawkins could be held. This being the fact, the assignment to Powers was a fraud upon the general creditors of Brown & Hawkins containing a. preference of a fictitious demand of Powers upon the firm of Brown & Hawkins. The learned court before whom this case was tried found that these contracts of sale were mere covers for the usurious agreements made between Powers and Brown & Hawkins, and therefore held the assignment to be void. This ruling would therefore seem to be correct.
It is now necessary to consider the transactions between Brown & Hawkins and Schmohl, Schmohl claims that Brown & Hawkins were indebted to him in the sum of $8,000 for the purchase of 500,000 brick at ten dollars a thousand and 100,000,000 of lath at three dollars a thousand. It appears that on the 9th of December, 1879, although Schwohl was a clerk to Brown & Hawkins, and had not, so far as the evidence shows, been dealing in these materials, he, at the solicitation of Hawkins, bought 500,000 "brick at $7.25 a thousand, amounting to $3,625. He paid $3,000 in cash and the balance by'a note of Brown & Hawkins, which he held, and several other small claims, and he states that at the time of this transaction it was agreed that in about three months Brown & Hawkins should buy back this brick at an advanced price. Brown & Hawkins also gave to Schmohl a note of $3,685 the amount which he paid for the brick.
The giving of this note would seem to indicate that me transaction was intended as a mere loan of money to be paid back to Schmohl, the interest to be represented by the advanced price which he was to be paid for the brick. Schmohl says that on the ninth of March, 1880, Brown & Hawkins bought back this brick at ten dollars a thousand, *178 "but never paid the purchrse price. It appears that during these three months they had been treating this brick as their own, as they sold a large portion of it. On the 16th of February, 1880, Brown & Hawkins sold to Schmohl a million of lath at two dollars a thousand, which Schmohl paid them for, and they immediately agreed to take back the lath in three months at three dollars a thousand, this being interest at the rate of 200 per cent per annum.
It further appears that Hawkins, having got in trouble with Murchie by reason of the disposition of some property for which he had given warehouse receipts, and also with Powers because of the sale of some of the property pledged to him, caused to be given to Schmohl a bill of sale of all the property in Fourteenth street. At the same time Schmohl surrendered the note for $3,625 and the note for $3,000. It is apparent that this bill of sale was intended to be nothing more than a security to Schmohl, because no-price whatever was fixed at which he was to take the property, and the giving of the bill of sale was coupled with a promise to pay him $3,000 additional in a few days and an agreement to settle whatever difference there might be. In respect to Schmohl’s good faith, it is true that he says that he did not know anything about Brown & Hawkins being embarrassed or that any notes had gone to protest, or that there were any difficulties ahead.
But it is impossible to believe in such a statement, in view of the fact that he held a bill of sale of all the property which Brown & Hawkins owned at their principal place of business. That Hawkins did not understand this bill of •sale to be anything more than a cover, is evidenced by the fact that he subsequently assigned some of this very merchandise to Murchie; and that Schmohl so understood it as evidenced by the fact that up to the time of the assignment there was no open and notorious change of possession, the business went on precisely the same as before, goods were sold and delivered to the customers of Brown & Hawkins, and were charged in their books, and Schmohl remained as the clerk of Brown & Hawkins until the assignment, and stated that his salary was due for that week. The necessary inference from these conceded facts,. notwithstanding the entries made in the accounts of W. H. Schmohl & Co.,, and H. Sewell is that Schmohl was not conducting his own business, but that he was still engaged in the business of Brown & Hawkins until they made the assignment. There is no evidence that any of the employees of Brown & Hawkins knew anything in respect to this bill of sale to Schmohl until after the assignment, or that Schmohl made any claim or statement in respect to the ownership of this, property to any person whatever, except when Murchie. *179 claimed some portion of it by reason of the assignment by Hawkins to him. This evidence amply sustains thefinding of the learned court below, that there was no delivery of the property embraced in the bill of sale made by Brown & Hawkins to Schmohl at any time before the execution of the general assignment in question ; that said bill of sale was contrived by said Brown & Hawkins, and accepted by said Schmohl with intent to hinder, delay and defraud the creditors of said Brown & Hawkins.
It may be true that at the time of the giving of this bill of sale, Hawkins did not contemplate the making of a general assignment, but it was part of a series of fraudulent acts which led to the making of the general assignment, and is, therefore, to be considered and construed in connection with the subsequent execution and delivery of that assignment.
It has been urged that in consequence of the existence of the assignment, the plaintiffs in this action could not attack the bill of sale given by Brown & Hawkins to Schmohl. That might be true if the assignment itself had not been set aside. But in one action the plaintiffs may attack any and every conveyance of property which the judgment debtors may have been with the intent to hinder, delay and defraud their creditors, and if they succeed in proving, as they have done in this case that the general assignment is void because of fraud, they may also in that action attack any other conveyance or instrument which may have been executed by the fraudulent debtors in order to withdraw their property from the claims of their creditors, and that is all that is sought to be done in this action in reference to the bill of sale to Schmohl. It having been ascertained that the bill of sale to Schmohl was given and accepted with the fraudulent intent of protecting the property of the judgment debtors from the claims of their creditors is absolutely void, although an indebtedness may exist in favor of Schmohl against the makers of the bill of sale.
This brings us to consider some of the exceptions which are pertinent to the evidence which has been considered in coming to the foregoing conclusions.
At the opening of the plaintiff’s case, the counsel for the defendants moved to dismiss the complaint upon the ground that it did not state facts sufficient to constitute a cause of action, in that it failed to allege the specific acts of fraud which the plaintiffs claimed constituted the ground for setting aside the assignment. This motion was denied and an exception taken.
It is claimed that where the fraud complained of is extrinsic to the instrument of assignment, the plaintiffs *180 should aver fully and explicitly the facts constituting the alleged fraud. This rule may be entirely correct, but it does not militate against the decision of the court upon the motion to dismiss the complaint. The complaint was not 'demurrable upon its face, and that was all that the motion to dismiss brought up for the consideration of the court. The assignment was not in evidence and not before the court. As to whether it was void upon its face or not, the court had no knowledge and could not determine until the evidence was before it. If it was desired to insist upon this objection it should have been again taken when evidence was offered to prove facts constituting the fraud which has not been properly alleged in the complaint. It will be observed, hower, that although exceptions Were taken to the admission of the evidence in respect to the transaction with Powers, the only ground stated was that the- evidence was incompetent and immaterial and not within the issues. An examination of the record will show that the latter part of the exception referred to the fact that there was no allegation in the complaint by which the transactions between' Hollis L. Powers and Brown & Hawkins could be impeached, and that the objection was not intended to be upon the ground that such evidence could not be offered for the purpose of impeaching the general assignment. When this class of evidence was first being offered the objection was stated to be upon the ground that there is no allegation in the complaint of any fraudulent transfer to Powers, other than the property conveyed by the general assignment. In answer to this objection, the plaintiff’s counsel said: We offer this now as a part of the evidence of fraud of the assignors. Thereupon the objection was overruled, and an exception taken. That was the character of the objection which was presented to the court, and that was the only objection which was overruled, and the attention of the court was not called to the fact that because of the want of specific allegations of fraud in respect to the assignment, this evidence was not admissible.
Objection was also taken to the admission of the testimony of William H. Brown, taken in proceedings supplementary to execution, and also to the testimony of Schmohl, taken in another action. This evidence undoubtedly was not admissible as against the other defendants. It was admissible as against them individually, and it was offered only as against them, and there is no evidence that it was ever received or considered for any purpose beyond that for which it was offered. If it had been offered generally, the ruling would have been erroneous, because neither the declarations of Brown nor of Schmohl, made *181 after the assignments would be any evidence against the other defendants, whether they were purchasers for value or not.
It is argued upon the part of the defendants Murchie, that the court erred in refusing them affirmative relief in respect to some portion of the goods held by Schmohl. It does not appear exactly how the controversy of Murchie and Schmohl, in respect to the title of those goods, could be disposed of in this action. It is true that the defendants Murchie were, upon their own request, madé parties to this action, but they were made parties because they were interested in the assignment as preferred creditors, and the court, at general term, in making them parties stated that as such preferred creditors they had a direct and specific lien upon the property forming the subject of the assignment and are, therefore, interested in maintaining it. And it was only because of that fact that they were made parties, and not for the purpose of enabling them to settle in this action any controversy they might have with Schmohl. Such a controversy was entirely foreign and distinct from the whole subject matter of the action itself and could not be lugged in by any claim which the defendants Murchie might make in respect thereto. There was, therefore, no error on the part of the court in refusing to give the defendants Murchie any relief against the defendant Schmohl in this action.
It would appear, therefore, that the court was justified upon the conceded facts of the case in holding the assignment from Brown & Hawkins to Powers to be fraudulent and void, and that the bill of sale to Schmohl was also fraudulent and void. But there does not seem to be any authority for the money judgment against Schmohl for the alleged value of the property covered by the bill of sale of the thirteenth of April. It is true that in this proceeding Schmohl could be made to account for all the property received under that bill of sale. But he was not liable in the first instance for the alleged value of this property until he had refused to turn it over to the receiver appointed in this action as part and parcel of the property of Brown & Hawkins. There does not either seem to have been any authority for the money judgment rendered against the defendant Hollis L. Powers, individually. No relief was granted in the judgment against him individually, nor could any such relief have been granted, because none was claimed in the complaint, and evidence tending to justify such relief was objected to at the trial, and consequently the pleadings could not be amended so as to include such relief.
The judgment must, therefore, be modified by striking therefrom the recovery against Schmohl for the property *182 -mentioned in the bill of sale, and the judgment for costs and allowances against the defendant Powers, and as thus modified affirmed without costs of appeal to either party.
Brady and Daniels, JJ., concur.